Jacqueline Williams, In Pro Se
1062-55th Street, Apt A
Oakland, Ca. 94608

**FILED**

JUN – 3 2008

In The United states District Court
RICHARD W. WIEKING
For The Northern District. U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**RECEIVED**

JUN   3 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Jacqueline Williams

Plaintiff,

V.

Oakland Housing Authority

Defendant.

Case No: C 08-01238 JSW
Amend Complaint

Plaintiff was order to amend this complaint, plaintiff also asking the resigned Judge Jeffrey S. White to step aside and let another judge take this case. In addition, plaintiff was evicting from Section 8, because Judge White refused to answer the papers work that plaintiff filed with the court. Plaintiff feel that if, Judge Jeffrey S. White keep plaintiff case there wills not be any "Justine at all" look at hurricane Katrina, still a ghost city, Jena Six, plaintiff from New Orleans and know what society think of plaintiff.

## Plaintiff alleges:

1. Defendant(s) Oakland Housing Authority and Noemi Almaraz and her supervisor is and at all times mentioned in this complaint was employees in Alameda, by a corporation duly organized and existing under the law of the State of California with its principal place of business in the City of Oakland, Alameda County, California

2. Defebdabts Does 1 through 100, inclusive, is sued herein under fictitious names. Oakland Housing Authority and capacities are unknown to plaintiff. (Plaintiff is informed and believes and thereon alleged that each of the fictitiously named defendants Oakland Housing Authority and Noemi Almaraz and her supervisor is responsible in some manner for the occurrences herein alleged, and that plaintiff's damages as herein alleged were proximately caused by those defendants.)]

[3. (Plaintiff is informed and believes and thereon alleges that,)(A) t all times herein mentioned, defendant Oakland Housing Authority was the agent of defendant Noemi Almaraz and her supervisor and, in doing the things hereinafter alleged, was acting within the course and scope of such agent and with the permission and consent of codefendant.]

4. Plaintiff [Allege that defendant Oakland Housing Authority is a business establishment within the meaning of the Unruh Civil Rights Act, e.g., At all times herein mentioned, defendant Oakland Housing Authority was the employee for defendant Noemi Almaraz and her supervisor of a business establishment engaged in the business of Oakland Housing Authority to be consumed on the premises) commonly known and designated as Oakland Housing Authority, situated in Oakland, Alameda County, California].

5. Plaintiff [Plaintiff act(s) of discrimination, e.g., on November 15, 2007, plaintiff entered Oakland Housing Authority with the intention and purpose to sign Annual Recertification Packet to be consumed on the premises. Plaintiff requested defendant Oakland Housing Authority, one of the defendant employee supervisor refused to investigate this complaint that was make by plaintiff, concerning the defendant during the time plaintiff was on the above-mentioned premises.

6. Plaintiff [Allege protected characteristic of plaintiff enumerated in Act or which is an arbitrary basis for discrimination, e.g., Plaintiff is Black.

7. Plaintiff [Allege that plaintiff's characteristic was the reason for the act of discrimination, e.g., (Plaintiff is informed and believes and thereon alleges that) (D)defendants, and each of them, denied to plaintiff services, accommodations and facilities, and privileges provided to other persons, as alleged above, on account of plaintiff's race "Black", disability that is an arbitrary basis for discrimination, e.g., Oakland Housing Authority employee Noemi Almaraz told plaintiff, going through the hallway, of Oakland housing Authority exist front door, defendant Noemi Almaraz knew plaintiff was using Methamphetamine and methamphetamines traffic, and other criminal behavioral and life style at 1062-55th Street, Apt A. Defendant want plaintiff to answer some of the following questions. (4) Have you or any person living in your household engaged in and criminal activity such as illegal use, possession, or distribution of a controlled substance and/or violent criminal activity within last three year.

8. Plaintiff (Allege that defendant's Oakland Housing Authority wrongly conduct is continuing, e.g., defendant's Noemi Almaraz and her supervisor wrongly conduct is continuing to deny plaintiff and all person of plaintiff's race, "Black", disability that is an arbitrary basis for discrimination, e.g., political affiliation) the full and equal accommodations, advantages, facilities, privileged, and services of the above-mentioned business establishment).

9. Unless Defendant Oakland Housing Authority and Noemi Almaraz and her supervisor is restrained by a preliminary and permanent injunction, plaintiff's injury

will be great and irreparable. Plaintiff has no plan, speedy, and adequate remedy at law because defendant(s) Noemi Almaraz reference to plaintiff as a methamphetamine user and methamphetamines traffic and other criminal behavioral at 1062-55th Street, Apt A, and that it would be extremely difficult to ascertain the amount of compensation that would afford adequate relief, and/or that restraint is necessary to prevent a multiplicity of proceedings, e.g., it will impossible for plaintiff to determine the precise amount of damage that plaintiff suffer if defendant 's Noemi Almaraz conduct is not restrained or plaintiff will be forced to institute a multiplicity of suits to obtain adequate compensation if defendant Noemi Almaraz conduct is not restrained).]

10. Set forth any actual damages sustained as proximate result of defendant Noemi Almaraz and her supervisor. [Violation of Americans with Disabilities Act is violation of California's Unruh Civil Rights Acts, and actual damages suffered are thus compensable. Boemio v. Love's Restaurant, S.D.Cal 1997, 954 F. Supp. 204 Civil 1017; Civil Rights 1764

I declare under penalty of perjury under the law of the State of California that foregoing is true and correct.

Dated 1 of June 2008

Jacqueline Williams, In Pro se

Jacqueline Williams, In Pro Se
1062-55th Street, Apt A
Oakland, Ca. 94608



RECEIVED

JUN      3 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

United States district Court

Northern District of California

Jacqueline Williams

        Plaintiff,

V.

Oakland Housing Authority

        Defendant

------------------------------------------

Case: C 08-01238 JSW
Complaint For Damages For Libel

Plaintiff alleges:

1. Defendants Oakland Housing Authority and Noemi Almaraz and her supervisor at all times herein mentioned was a resident of Alameda County, California.

[2. Plaintiff is ignorant of the true name Oakland Housing Authority and capacities of defendant Noemi Almaraz and her supervisor sued herein as does 1 through 100, inclusive, and therefore sue these defendants by such fictitious name Oakland Housing Authority. (Plaintiff is informed and believes and thereon alleges that each of the fictitiously names defendant Oakland housing Authority is responsible in some manner for the occurrences herein alleged, and that plaintiff's damages as herein alleged were proximately caused by their conduct.)]

3. Defendants Oakland Housing Authority at all times herein mentioned were the agents and employee of the their codefendant Noemi Almaraz and her supervisor and in doing the things hereinafter alleged were acting within the course and scope of such agency and the permission and consent of their codefendants.]

4. At all times herein mentioned, plaintiff was and now is , a residence and resides in the City of Oakland, County of Alameda, State of California for thirty-two years and at all times has enjoyed a good reputation both generally and both in his/her occupation.

5. On and about November 15, 2007 defendant(s) Noemi Almaraz and her supervisor published documentation asking plaintiff question concerning criminal behavioral and methamphetamine user and methamphetamine traffic at 1062-55th Street, Apt A., [set forth precise language alleged to be defamatory].

6The entire complaint is false as it pertains to the plaintiff.

7. This document is libelous on its face. It clearly exposes plaintiff to hatred, contempt, ridicule, and obloquy because, on and about November 15, 2008, defendant(s) Noemi Almaraz and her supervisor accused plaintiff of lying fraud, deceitful.

8. Negligent of Emotional Distress Defendant(s) Oakland Housing Authority incorporates the entire allegation in the preceding paragraphs as it fully set forth in this cause of action. Defendant Oakland Housing Authority knew, or should have reasonably know, that defendant Noemi Almaraz and her supervisor failure to exercise due to care. Defendant Oakland Housing Authority knows or should have know, that its conduct in ratifying the actions and cause plaintiff severe physical and emotional distresses.

9. The entire allegation is false as it pertains to the plaintiff, the acts and omissions that described in the above action of defendant Oakland Housing Authority. Deprives plaintiff of the following constitutional rights, which clearly established and settled.

10. Intentional Infliction of Emotional Distress Defendant's incorporates the entire allegation in preceding paragraphs as it fully set forth here. Defendant Oakland Housing Authority and Noemi Almaraz and her supervisor conduct were intentional and malicious, done with the purpose to cause plaintiff distress. Defendant(s) Oakland Housing Authority conduct is confirming and ratifying the conduct with the knowledge, that plaintiff physical and emotional would be increased was don with wanton and reckless disregard of the consequences of plaintiff.

11. Defendant(s) Oakland Housing Authority owes plaintiff money from a previous lawsuit in Small Court for $1,344 and refused to pay. Which clearly exposes plaintiff to the hatred, and contempt, ridicule, and obloquy plaintiff have proof of numbers of letter. Plaintiff submitting more exhibits, Exhibit's a Page 1 of 16 Assistant Secretary for Fair Housing and Equal Opportunity Exhibit's B Page 1 of 3 Victory for tenants accused of bribery and Exhibit's C Page 1 of 10 Wrongful Mass Eviction Case Settled by Oakland Housing Authority and Exhibit's D Page 1 of 4 Wrongful mass eviction case settled by Oakland Housing Authority and Exhibit's E Page 1 of 2 U. S. Department of Housing and Urban Development.

I declare under penalty under the law of the State of California that foregoing is true

in addition, correct.

Dated: 1st of June 2008

Jacqueline W+ —— In Pro Se

Jacqueline Williams, In Pro Se

Jacqueline Williams, In Pro Se
1062-55th Street, Apt A
Oakland, Ca. 94608

United States District Court

Northern District of California

Jacqueline Williams

    Plaintiff,

V.

Oakland Housing Authority

    Defendant

---------------------------------

Case: C 08-01238 JSW
Complaint For Personal Injury

Plaintiff alleges:

1. Defendant Oakland Housing Authority and Noemi Almaraz and her supervisor is, and all times mentioned in this complaint was resides and residence of defendant Oakland Housing Authority a resident of Alameda County, California duly organized and existing under the laws of the State of California with its principal place of business in Oakland, Alameda County, California.

2. Plaintiff is a=ignorant of the true names Oakland Housing Authority and capacities of defendants Noemi Almaraz sued in this complaint as does 1 through 100, inclusive, and therefore sues these defendants by theses fictitious manes. Plaintiff will amend this complaint. (Plaintiff is informed and believes and alleges on tis information and belief that each of the fictitiously manes defendants Oakland Housing Authority and Noemi Almaraz and her supervisor is negligently responsible in some manner for the occurrences alleged in this complaint, and that plaintiff's injuries in this complaint were proximately cause by that negligence.)]

3. (Plaintiff is informed and believes and on this information and belief alleges that (A) t all times mentioned in this complaint each of the defendant Oakland Housing Authority was the agent and employee of each of remaining defendants, Noemi Almaraz and her supervisor and in doing the thing alleged in this complaint, was acting within the course and scope of this agency and employment.]

4. At this time and place, defendant[s and each of them,] negligently telling plaintiff over and over again that plaintiff is methamphetamines user and methamphetamine traffic and other criminal behavioral and life style allege acts or omissions of defendant Noemi Almaraz and her supervisor, e.g., service allege the result of defendant Noemi Almaraz and her supervisor negligence constituting breach of duty owed plaintiff, e. g., directly and legally cause the injuries and damages described.

5. As a direct and legal result of the negligence of defendant[s, Noemi Almaraz and her supervisor each of them,] plaintiff was injuries in his/her health has caused and continues to cause plaintiff great mental, physical, emotional, and pain and suffering. [Plaintiff is informed, believes, and on this information and belief alleges that these injuries will result in permanent disability to plaintiff because of these injuries, plaintiff has suffered general damages in an amount.

6. As a further direct and legal result of the negligence of defendan[s and each of them,].

I declare under penalty of perjury under the law of the state of California that the foregoing is true and correct.

Dated 1ˢ of June 2008

Jacqueline Williams, In Pro Se

Exhibit's A  Page 1 of 16

Assistant Secretary for Fair Housing and Equal Opportunity

Case 3:08-cv-01238-JSW     Document 9     Filed 06/03/2008     Page 9 of 49

# Wrongful Mass Eviction Case Settled by Oakland Housing Authority

## A case of fraud & corruption in the OHA reaches conclusion:
## Lockwood Gardens

### LYNDA CARSON / Indy Media News Wire 11aug2007

[More by Lynda Carson]

Oakland, CA — After 34 families were falsely accused of being unlawful occupants (squatters), and paying bribes to a housing authority clerk to obtain their public housing units, tenants at Lockwood Gardens public housing complex can rest a little easier since the Oakland Housing Authority (OHA) dropped all attempts to evict, and recently negotiated settlements for all of those cleared of any wrong doing.

The Lockwood Gardens mass eviction case began in early 2006, after a partial investigation into corruption taking place at the OHA's East District Office, led to events in which 34 families faced eviction after being falsely accused of wrong doing to obtain their housing units.

According to the attorney's representing the tenants, "The Oakland Housing Authority instituted the lawsuits more than

a year ago, alleging these tenants used false identities and paid bribes to a Housing Authority employee to gain access to apartments they were not entitled to."

Evidence provided to the courts on behalf of the accused revealed that the tenants had all signed leases, paid rents, gave security deposits, received keys to their units, and had provided birth certificates, photo ID's, income verification and Social Security cards to the OHA before moving into their housing units.

Finding that the tenants were not unlawful occupants as alleged by the OHA and innocent of any wrong doing, the courts repeatedly blocked the eviction attempts, and no charges have ever been filed against any of the tenants at Lockwood Gardens by the District Attorney's office regarding allegations of fraud or bribery.

However, charges were filed against a former OHA clerk, and during July 2006 Carolyn Wilson was arrested near New Orleans and charged with 65 felony counts. She served less than one year in jail, after being convicted of one count of computer fraud and one count of misappropriation of public funds.

As a result of the settlement agreement reached between the OHA and the wrongfully accused, nineteen families are being allowed to remain in their housing while receiving two years free rent. They also received new rental contracts, all

past rental payments have been refunded back to the tenants, and the tenants do not have to start paying rent again until June 1, 2008. Attorney's involved in the mass eviction case believe that the other 15 families alleged to have been unlawful occupants may have fled in fear of their safety after receiving a number of late night visits by the OHA police, who pounded on doors and demanded that the tenants must move within a five day period or face future eviction proceedings.

Lockwood Garden's tenant Ira Turner says she is very grateful that her housing situation has finally been resolved. "This has been a big ordeal for me. Before moving in, I received a call from someone in the OHA asking me if I could use a one bedroom unit, and eventually moved into my current housing on December 3, 2005 after giving up $309.00 as a security deposit, and signing OHA documents and submitting all the paperwork asked of me by the OHA."

"During April 2006, two policemen from the OHA came by late at night and told me I had to get out. The OHA police told me I had to get out in 10 days. It was Officer Jerold Coates who treated me real bad, and told me I had to get out of here. I believe that Officer Coates still owes me an apology for all the stress he put me through which had me thinking of committing suicide at times. It was a real struggle to fight against this eviction because I'm a cancer patient, and a senior citizen on disability," she said. "It was

Jorge Aguilar of the Eviction Defense Center who kept
checking in on me at times, and he was the one that really
helped me get through this mess."

In a similar OHA Police incident during April 2006,
Lockwood Garden's tenant Ms. Kelly stated, "I am a 41-
year-old woman with an 11-year-old child, and I am very
frightened by the way the OHA has been treating me," she
said. "I was terrified recently when the OHA Police showed
up at my door around 10 p.m. at night, accusing my family
of committing fraud to move into this townhouse; and they
served me a five-day notice to surrender my home to the
OHA, or else."

The above experiences described by Ira Turner and Ms.
Kelly in regards to the OHA Police coming by late at night
to frighten them out of their housing, matches similar stories
described by other tenants at Lockwood Gardens.

Eviction Defense Center attorney Jorge Aguilar says, "This
is a huge victory for the tenants who fought against their
evictions, and I'm very happy for the families. The tenants
were all vindicated, and the proof is in the difference
between the allegations originally made by the OHA and the
recent results of the settlement negotiated with the tenants.
All the families get to remain rent free in their housing units,
and that speaks for itself. The OHA wanted to go down a
one way street the wrong way in this mass eviction

proceeding, and it was wrong. They tried to force a conclusion that was not factual in the final conclusion."

A joint statement from the attorney's who represented the public housing tenants says, "First and foremost, the public should try to keep in mind that cases are tried in courtrooms, not in the press. While the press is undoubtedly fundamental on a number of levels in our society, it is not a substitute for the legal process, which is designed to ferret out the truth. For our clients, we are happy to report that the legal system unearthed the facts and these tenants can move forward with their lives."

In disagreement with the courts findings, OHA spokesperson Bronwyn Hogan said, "The OHA disagrees with the rulings of the court. However, it was sensible to the OHA to settle this case, especially when considering that it involved 19 lawsuits which would end up being very expensive to litigate any further in the courts. We have made internal fixes to make sure this doesn't happen again, including the installation of a new computer system that will alert us to problems in the waiting list."

When asked if the OHA has offered an apology to the tenants, Hogan said, "We are not contending that the tenants were involved in any wrong doing, and the settlement shows that. We are treating the defendants like tenants now, and hopefully our settlement to the tenants is a message that the

tenants will find acceptable."

East Bay Community Law Center attorney Mark Janowitz
said, "I think the OHA tried everything possible to evict the
tenants from their housing in this case, despite the
overwhelming evidence confirming the tenants innocence.
The OHA came to their senses and finally settled with all the
families they wrongfully tried to evict. When tenants are
able to obtain legal representation, they can fight the worst
sort of accusations being thrown at them such as what the
OHA did to these tenants. I believe the entire community
benefits from such organizations as the East Bay
Community Law Center, the Eviction Defense Center, and
attorneys like Bob Salinas who are willing to offer legal
representation to those in need."

According to attorney Bob Salinas, "The Hardest thing to
understand about this case was knowing that the OHA had
enough information to know the tenants were innocent of
wrong doing, but they pressed forward with their evictions
anyway. I can't understand why they would do that. The
settlement actually occurred last May, but we waited until
early August to go public with the news because the OHA
Board of Commissioners had to approve it, and that whole
process took some time. I thought the resolution reached was
fair for the tenants and attorneys involved in the case."

According to a press release from the attorneys involved, it

says, "Because of the inherent public interest in such proceedings the Eviction Defense Center, East Bay Community Law Center, and private law firm of Sundeen Salinas and Pyle received $110,000 for the attorney time spent defending these cases, including at the First Appellate District."

While faithfully serving the housing needs of many thousands of low-income families in Oakland, in recent years this much needed agency has repeatedly been caught up into lawsuits and scandals during past years.

As recent as February 15, 2007 the City of Oakland sued the OHA accusing it of being Oakland's biggest slumlord, while claiming the OHA failed to properly maintain it's properties.

During April 2006, 34 families at Oakland's Lockwood Gardens public housing complex faced eviction after being accused of fraud and bribery by the OHA, to obtain their public housing units.

During July 2006, former OHA clerk Carolyn Wilson gained national media attention after being arrested near New Orleans and charged with 65 felony counts, as a result of fraud and corruption that occurred in an East Oakland OHA office.

During 1998 through 2002, the OHA received national media attention over it's use of the "One Strike Policy,"

while trying to evict four elderly public housing residents all over 60 years of age, for the suspected drug related activities of a caregiver and younger relatives accused of drug activity outside the homes of the innocent elderly public housing residents.

During 1999 through 2000, then Tribune reporter Chauncey Bailey wrote a series of articles exposing rent scams in the OHA's Section 8 housing program, detailing how some landlords were forcing tenants to pay more than their Section 8 contracts required.

During 1997, 41 public housing residents filed suit against the OHA because rats, roaches and maggots roamed an apartment complex that was poorly maintained by the OHA.

During 1994, an OHA clerk and four accomplices were under investigation and suspected of selling over $3000 worth of housing voucher certificates, including 76 fraudulent vouchers for around $350 to $600 each. Around 47 families may have been subsidized by use of the vouchers alleged to have been sold by the clerk.

During April 1992, nearly a quarter of the OHA's maintenance workers staged a sickout while protesting the firing of an employee who accused the OHA of mismanagement.

During April 1991, four ex-OHA police officers named

Daniel Broussard, Scott Dwyer, Larry Houston and Juan Reese, were all convicted of violating the civil rights of two undercover officers, including 12 other individuals at public housing properties, after originally being indicted for robbing people, beating them up, and faking evidence for false arrests.

During May 1991, the OHA announced that it would get rid of it's then scandal plagued police force, and replace it with a new police force supervised by the Oakland Police Department, after a third of it's officers were indicted in a brutality case during 1990.

During 1990, the OHA settled out of court with 42 people who claimed to be victims of beatings and false arrests by the OHA Police, in a settlement that was around $500,000, according to sources.

During August 1990, six OHA police officers were indicted by a federal grand jury and charged with robbing public housing tenants, beating them up, falsely accusing them of possessing drugs and arresting them, lying under oath, and the 19-count indictment also accused the officers of conspiring to violate the civil rights of those falsely accused.

During 1989, a $1 million lawsuit was filed by a man who claimed he was searched and detained without reason by the OHA police.

During December 1989, several undercover investigators posing as drug dealers at OHA's public housing properties were brutally beaten and robbed of $900 in cash by OHA police during nine separate run-ins at Oakland's public housing projects, according to a 396-page affidavit filed in court.

Lynda Carson may be reached at tenantsrule@yahoo.com

**To send Mindfully.org your comments, questions, and suggestions** click here
**The home page of this website is**
www.mindfully.org
**Please see our** Fair Use Notice

Exhibit's D Page 1 of 4

Wrongful mass eviction case settled by Oakland Housing Authority

Exhibit's B Page 1 of 3

Victory for tenants accused of bribery





powered by
YAHOO!
SEARCH

Home    News    Sports    Living    Entertainment    Business    Opinion    Choose a Publication    Help                Se

## Most Viewed

## Most Emailed

### (From the last 12 hours)

1. 49ers, Raiders evaluate for draft
2. Man shot today in Oakland not expected to survive
3. Apple keeps chipping away at Microsoft
4. Prostitution sting uncovers huge network
5. 32 arrested in

del.icio.us    Digg    Reddit    YahooMyWeb    Google    Facebook

# Victory for tenants accused of bribery
**Oakland housing agency's claims 34 families in homes illegally are rejected**

By Kamika Dunlap, STAFF WRITER
Article Created: 02/15/2007 12:40:47 AM PST

OAKLAND — The California Court of Appeals has denied the Oakland Housing Authority's t
group of Lockwood Gardens tenants accused of bribing their way up a lengthy public housin

The housing authority had challenged a September ruling by Alameda County Superior Cou
dismissed arguments 34 families were in their apartments illegally.

"By challenging the judge's decision OHA was in essence calling our clients squatters and w
put them on the street," said Robert Salinas, who represents several families. "It's a tremenc

Carolyn Wilson, a former clerk with the Oakland Housing Authority, is serving a one-year jail
probation for pushing people to the top of the long public housing waiting list after accepting
recently was convicted of computer fraud and misappropriation of public funds.

In the wake of the criminal case against Wilson, the tenants also filed civil lawsuits against tl
allegations they paid money to housing officials for higher spots on the waiting lists. The ten
were given keys to the apartments, but did nothing illegal to obtain their places.

According to authority spokesperson Bronwyn Hogan, filing the challenge was a way to see t
case along.

"We are

Advertisement

prepared, however, to kee
the proceedings." she sai

Chanteel Holoman and otl
case said the court ruling I
nothing wrong or fraudulet

"I will fight to the end." she said. "I feel like I have a right to live in here (Lockwood Gardens)

Many tenants said they are relieved to know they will not be evicted, but would like to see th

Tomisha Wade and her family have lived at Lockwood Gardens since 2005. Although she ha
attorney regarding the case, she worries she could still lose her housing

"I won't feel secure about my housing until the case is over and I know for sure." she said.

In a related issue, the city of Oakland is expected to file a lawsuit today accusing the Oaklan
maintain and repair its properties and for poor management practices. The housing authority
apartments in Oakland, of which

1,615 units do not have on-site managers.

## East Bay prostitution sting

The civil and criminal cases involving the management of public housing around the city hav demand for local affordable housing.

Currently, the housing authority can only provide units to one in every 11 families. About 14, public or Section 8 housing.

6. If talk meant wins, 49ers are champs

Print     Email     Return to Top

**(From the last 12 hours)**

1. `60 Minutes' to air segment on Bailey's death
2. Prostitution sting uncovers huge network
3. Two arrested protesting Marines office
4. 32 arrested in East Bay prostitution sting
5. 'Juvenile justice' is theme of interfaith group's action
6. Braden

wasn't told
'take a
hike,' but
did

Exhibit's D Page 1 of 4

Wrongful mass eviction case settled by Oakland Housing Authority

Exhibit's A  Page 1 of 16

Assistant Secretary for Fair Housing and Equal Opportunity

**Issue #79, January/February 1995**

Shelterforce Interview:

# Roberta Achtenberg

## Assistant Secretary for Fair Housing and Equal Opportunity

*By CHESTER HARTMAN*

Roberta Achtenberg, former Assistant Secretary for Fair Housing and Equal Opportunity, came to Washington from San Francisco, where she had been an elected member of the city's Board of Supervisors (city council). Prior to her election, Achtenberg worked for 15 years as a civil rights attorney, was a teaching fellow at Stanford Law School, Executive Director of the National Center for Lesbian Rights, and Dean of the New College of California School of Law.

**Chester Hartman**: With the arrival of the Clinton Administration and your appointment, Fair Housing & Equal Opportunity has undergone a sea change, from being a lonely, weak stepchild at HUD to being central to every part of HUD's program. What have been your major accomplishments and major disappointments in your work at HUD so far?

**Roberta Achtenberg**: I have been on the job 16 months, and we have made great strides. We have completely reorganized. Under the Secretary's leadership, we have been able to increase the numbers of people assigned to my division, triple their training dollars, win funding for new fair housing initiatives, and put the entire field operation under my control, which had never been the case before.

**CH:** Where had it been?

**RA:** The fair housing enforcement operation essentially was under the control of the regional administrators. They didn't really work for the Assistant Secretary for Fair Housing: he didn't hire them, he didn't rate them,

and they were only indirectly accountable to him. After 15 months of hard work, we were able to turn that around. Now they operate directly under my control.

Inside the Department, the Secretary has elevated the notion that fair housing is an integral part of everything we do. And that has played itself out, not only in terms of more authority for the Assistant Secretary – greater staff, greater budget. It has also played itself out in terms of the level of deference to the fair housing mission that other parts of HUD give to it. I wouldn't say it has been as easy to put into place as one might have hoped, but we have been making steady progress in that regard.

The program Assistant Secretaries – in fact, the entire political staff and much of the career staff – have actually been in favor of that. People retained the notion that in addition to producing affordable housing we had to distribute HUD's resources fairly.

One of the things that we saw early on was having the Department accept responsibility for policies and practices that it had allowed to go on in the past: either HUD had participated inadvertently in allowing segregated practices to be put into place or had, in some cases, known they were being put into place and did very little to stop that from happening. That took place over a period of many years, decades in fact. So we set about trying to settle the meritorious pending housing discrimination cases in which HUD was a defendant.

Obviously, the integration efforts in Vidor and other parts of East Texas have been viewed as a symbol of the kind of action this Administration is willing to take, and I would term that as another success.

The enforcement side of fair housing that I have responsibility for required restructuring from the ground up. We had many, many employees who had worked at HUD a long time, and who were committed to the civil rights mission, but who have never been put into proper restructured work groups, never been sufficiently trained, never had participated in articulating what the fair housing mission should be and what their role should be in it. The ability to transform that bureaucracy into a better enforcement operation has been something of major significance we have been able to accomplish in a relatively short time. The Title VIII enforcement process takes up a large part

of the fair housing resources that are available. It is a very important individual guarantee that each person have access to housing without discrimination.

**CH:** What about on the negative side: things you thought you might be able to accomplish by this time that you feel frustrated about?

**RA:** I have to admit that I didn't know how long all of this would take. It seemed in the beginning that we should be able to accomplish major changes in 3 1/2 years, then the basics would be in place, and my successor would be in a position to take off from there, which is exceedingly important to rebuilding an institution, beyond publishing regulations. I would say that the pace of change has been disappointing, and although we've tried to motivate people to work as quickly as they can and to work harder than they have ever worked, it still takes a very, very long time. I don't think I have succeeded in trying to get people to focus on the essentials of the fair housing law and what is important and what is not.

The Department has had a tradition of focusing its investigative resources as much on isolated instances of discrimination by "mom and pop" housing providers, as it has on systematic cases of discrimination by a large brokerage firm or a multi-state management firm. And I haven't been able to reorganize that process, to make the kind of resource judgments I think we need to make. This is an era of diminishing resources and increasing claims on resources. I don't think discrimination is on the wane. In fact, I think the opposite probably is the case. We need to be much more strategic than we have been.

**CH:** As I understand it, the way the Title VIII complaint system works with HUD and the Justice Department is that if either party in the complaint chooses to have Justice involved in the investigation, resources have to be put there on a case-by-case basis rather than in the pattern and practice type of cases, which you would obviously prefer. Is that a resource allocation issue you can't do anything about because it's the law?

**RA:** If I make a reasonable cause determination, which means that a tremendous amount of HUD investigative resources have already gone into the process, the Justice Department has to take that case. They complain about that, and I completely understand that. That's the way the law is written. I won't suggest that we tamper with the law. Individual rights should have some

meaning, and in the event there is a reasonable cause determination, then what should go along with that is the investment of government resources.

**CH:** But it does take away from your ability to get at the larger patterns.

**RA:** Yes, but the truth is that even within the constraint of individual claims, we should be expending more investigative resources and more HUD lawyer resources on the most egregious cases, the cases with the largest impact, the cases that really matter.

**CH:** So you're saying that even within the individual cases there could be better priorities. Why isn't that done?

**RA:** Well, we haven't gotten to that yet. Our investigators need a higher level of training. In the process of reorganization, we had five of our regional fair housing directors retire, so we are hiring five new directors, which, given the government personnel process, is a huge undertaking. There are only so many things you can do. Beginning in January, we are going to engage in what they call Business Process Re-Engineering; it's a fancy name for looking again at what you do and how you do it, and paring it down. That will take about six months. And this will focus on a priority-setting process for our investigations. I would have thought that almost two years into my tenure we would have been able to accomplish that.

**CH:** One of the criticisms I've heard is that your office doesn't have enough housing specialists to deal effectively with CPD, PDR, Housing, etc. Is that something you feel is lacking?

**RA:** I suppose that's true to some extent, but we're trying to deal with that issue. One way is to impress on everyone the fact that just because you come from Housing does not absolve you of the civil rights responsibility that all these programs carry. So in addition to our people needing to be expert with regard to the conduct of their program, they also need to develop some civil rights expertise that will enable them to unearth the civil rights problems they face.

The people who work in my field offices, where almost all of the program operations review takes place, are actually quite knowledgeable about the operation of all of HUD's programs. They're not as expert in housing as the

housing specialist is, but they are trained about how all of HUD's programs operate so that they can oversee implementation of the civil rights requirements. I don't believe our people lack expertise. They certainly have lacked the authority to make their judgments stick, and as a result, the Secretary has given them new authority. They now have delegated civil rights authority. What will go with that is not only advanced training in how the various HUD programs operate, but also training in how you exercise authority and power for people who have not had it to exercise before. When "no" has never meant "no," that puts you into a certain kind of mindset.

With this new power, a lot of mistakes probably will be made. It may very well be that my people will end up saying no when ultimately they could have worked out a way to get to yes. But we are willing to take that chance, because it is very, very important that the civil rights requirements for all the programs be taken seriously. One way you take them seriously is by saying to all of the housing directors – I talked to all of Nic's (Nicolas Retsinas, Assistant Secretary for Housing) 148 housing directors last week – "This is your responsibility, too." When HUD does wrong, when the civil rights requirements are not carried out by the assisted housing program or through the community development block grant program or by public housing authorities, it's your responsibility as well as mine to recognize that the people we serve have been deprived thereby of free and fair housing choice, which they are entitled to.

**CH:** Do old-line HUD staff react well to that?

**RA:** It's a different environment now. The Secretary cares about that. The Assistant Secretaries care about that. And as I say, there are many, many career staff at HUD, at the highest levels and at the lowest levels, and many in between as well, who care about this stuff. But there has not been the culture at HUD, for a very long time, to encourage and support folks in standing up for these things.

**CH:** Historic racial discrimination in public housing and other HUD programs is widespread and obvious. HUD's recent settlement in the Allegheny County litigation was greeted quite positively by the advocacy community. And quite extraordinarily, HUD recently hired as Deputy General Counsel Elizabeth Julian, one of the attorneys suing HUD in an East Texas public housing discrimination suit, which signals an effort to deal with these

problems all over the country. Is the Sanders settlement a model for such suits, and is the money available to do this?

**RA:** The Sanders settlement has many elements that I believe will provide the backbone for settlement of the meritorious racial discrimination suits.

**CH:** How many of them are there, roughly?

**RA:** Twenty-some.

**CH:** All over the country?

**RA:** Yes. Much of the Sanders settlement is predicated on the assumption that many of the public housing funding programs will be ongoing, and I'm not sure that is necessarily a given as we speak.

On the comprehensive housing mobility center, that kind of model will be integral to settlement of a lot of these cases. It's one thing to say we will provide desegregative housing opportunities to the victim class and to say we will do it in the form of X hundred Section 8, tenant-based certificates. But we know from experience that if we do not assist residents in locating appropriate Section 8 rentals of sufficient housing quality, and if we do not do the range of mobility counseling or fund it being done, then essentially we're compensating the victims of our past discrimination by giving them a Section 8 certificate that they are likely to use in another segregated, racially concentrated, impoverished area, because that is where most Section 8 subsidies are exercised.

So this sort of comprehensive care housing service center, which includes mobility counseling, and then enforcement if necessary, was key to the settlement in the Sanders case, and that would be typical if we made a comparable proposal in East Texas, Dallas and the whole host of other cases. I would expect it to be a centerpiece, the way in which we would offer to desegregate the housing opportunities to people whom HUD policies had helped to segregate.

**CH:** The controversy over the Moving to Opportunity program in Baltimore derailed the second-year funding for the entire program [see _____, this issue]. What lessons can be learned from that experience, in terms of building public support for a deconcentration strategy? And do you think that backlash

is going to arise elsewhere?

**RA:** There are lessons to be learned. Will that kind of resistance arise elsewhere? It has not to date. There are many other sites where MTO is operating just fine, thank you very much. And we have obviously been keeping a much closer eye on even a hint of the kind of political resistance that arose there. Both the private mobility counseling agencies we have retained as well as the HUD field offices and the offices that are located proximate to the demonstration sites are all much more on top of any issues that might arise, and let us know quickly if political intervention is needed.

**CH:** That's an early warning system once trouble is brewing, but can anything be done to prepare people better so that the trouble doesn't brew in the first place?

**RA:** We have been talking about this. I think a community organizing strategy could and should be encouraged and supported by HUD. There are good folks out there, a lot of folks in favor of this as an anti-poverty strategy, people who understand the value of mobility, not only to the families who are provided the opportunity to live in neighborhoods of their choosing, but to the communities where these folks choose to live. Under the MTO program, people get counseled, they are screened, they are assisted, they are counseled after placement. People who go through the program make good neighbors, in addition to the program being a personal economic benefit to themselves and to their children.

So it's a decent proposition all around. Obviously, more information about all of that needs to get out. My view is that the eruption of this issue in the Baltimore area centered as much around the fact that there was an upcoming election and some folks saw a way to make hay, as there was genuine resistance on the part of folks in Dundalk or Essex that people were coming from inner-city Baltimore to their neighborhoods. Because, in fact, people were not coming to their neighborhoods, but they were upset nonetheless.

**CH:** When you say, in fact they weren't coming to their neighborhoods, what do you mean?

**RA:** Because of the way the MTO program is structured. This is for people living in high concentrations of poverty who move to areas of very low

concentrations of poverty, and neither of the two areas that believed they were affected were. They couldn't be receiving areas to begin with. But that didn't make the fear any less.

**CH:** If MTO is either dead or stalled, are there other strategies you might propose to achieve some of the same dispersion goals?

**RA:** We have a much more large-scale and systemic effort in mind. We want to make the Section 8 program itself a much more significant vehicle for promoting housing choice, which in many cases would promote mobility, but not necessarily. The point is that people should be able to choose the neighborhoods they live in, given the minimal subsidy that is represented by the Section 8 certificate. Section 8 certificates don't enable folks to live either in tony neighborhoods or to live particularly well by middle-class standards. But to the extent that the certificate does give you more housing options than you would otherwise have, we want people to be able to exercise those options.

**CH:** Does that involve regionalizing Section 8?

**RA:** Regionalizing it, and trying to make the counseling responsibility that public housing authorities currently have for distributing Section 8 certificates a much more serious and better funded part of their operation. And they can achieve that either through beefing up their own counseling operations, or, more likely, through partnering with nonprofits.

**CH:** It's more likely to be successful if they use nonprofits, but, given bureaucracies, aren't they more likely to use the money themselves?

**RA:** Not the way the program will be structured. It is our hope that we will have the ability in the coming year to fashion a program that will encourage public housing authorities to partner with nonprofit fair housing groups or other private sector, nonprofit players, who could offer a level of counseling of the Chicago (Gautreaux) type.

In fact, even if new sources of funding for such an effort were not available, Assistant Secretary for Public Housing Joe Shuldiner and his headquarters staff are very, very committed to re-working the Section 8 program within existing needs to put greater emphasis on those housing authorities that take

this counseling responsibility seriously, so I'm optimistic in that regard.

Within existing legal and budgetary constraints, there is a lot we can do that HUD has not, up until now, done to promote housing choice.

**CH:** Let me switch to another issue: research. What kinds of social science research have been useful to you in addressing fair housing issues? What additional kinds of academic research would you like to see carried out that would support your work?

**RA:** Mike Stegman and the revitalized PD&R operation he is running up there have been an extraordinary asset to our fair housing operation. I'm not sure how PD&R typically operated in the past, but in the last 15 months, their operation has been just invaluable to us, in getting us consultants from the Urban Institute, for example, running all kinds of programs and analysis that help me figure out whether there might be more flexible ways of achieving some of our Title VI goals in the administration of public housing. They have been able to advise us on everything from how we should judge what constitutes a disparate impact to what extent residency preferences pose legal problems.

**CH:** Do you propose research projects to him? How has the research helped to get things done? Do you say, "Mike, I need this, this and this?"

**RA:** Yes. Typically, I work through Marge Turner, his Deputy, whose area is primarily fair housing. They not only can procure consultant services more easily than we can, but Marge can set the research parameters. I tell her, "Can you find out what is statistically significant about X, Y, or Z?" And she can find it out, or she can tell me that's not the right question to ask – the right question to ask is such and such.

They have been incredibly helpful. I'll give you a current example. As we started on this property insurance effort, following President Clinton's Fair Housing Executive Order of January, in addition to the Secretary having to set up the President's Fair Housing Council, the Executive Order says the Assistant Secretary of HUD shall promulgate fair lending regulations and regulations governing the provision of casualty and property insurance. So we have been looking very seriously at that responsibility and trying to define what is an unlawful practice under the federal Fair Housing Act.

In doing this, I was assisted by Greg Squires (a University of Wisconsin-Milwaukee sociologist), whom we hired essentially to help us spearhead this effort, and he compiled all the literature on this issue and did summaries of it. We took the entire issue to the Secretary, who noted there has yet to be done a definitive study that would demonstrate insurance redlining practices, in the same way that the Boston Fed study demonstrated there was definitely a problem of fair lending that the industry needs to address. He said, "Why don't you go talk to Stegman and see what could be accomplished here." So we did. We put together a working group and really explored all of the possibilities and the timeframes under which we had to operate, and he has commissioned a research project in this area that I think will give us very valuable information on the nature and extent of the problem, and one that I think will be of great assistance to us as we try to develop an appropriate regulatory framework in this area, where none before us have trod.

**CH:** HUD has recommended revising and liberalizing occupancy standards, particularly the number of persons allowed per bedroom, since such standards tend to discriminate on the basis of national origin, cultural patterns and family status. Property owners have been lobbying against this, partly using wear-and-tear arguments, but more realistically they simply don't want to lose control over tenant selection. What does HUD plan to do on the occupancy standards issue?

**RA:** The General Counsel (Nelson Diaz) has said he will be reviewing the Keating memo (issued by HUD Secretary Jack Kemp's General Counsel Frank Keating March 20, 1991), which has been read to suggest that HUD would adhere to something approaching the 2-persons-per-bedroom standard. In fact, that was not what the Keating memo says, but it has been construed to mean that in many cases, which I think both the General Counsel and I agree is not the rule, should not be the rule. So the General Counsel has said he will be withdrawing the Keating memo, and we are now putting the fine points on the guidelines that would take its place in the interim as we go through the process of promulgating a rule. That should be done in a relatively short time. We intend to do this right.

**CH:** Will the rule be more sensitive to some of the relevant cultural differences?

**RA:** Yes. Both the General Counsel and I have committed ourselves to that.

Obviously, the rule has to be clear and helpful, but it has to take into account the notion that occupancy standards are all culturally imposed. Clearly, the standards need to be more flexible and less biased against larger families and against people whose traditions are not necessarily those of the dominant culture.

**CH:** On lending discrimination, apparently there is some public inter-agency squabbling going on – at least some of the bank regulators are none too happy over the agreement that Chevy Chase Savings Bank just signed. Do you see that kind of agreement as a model you want to push? And if so, will HUD and the Department of Justice prevail?

**RA:** It's not quite as black and white as you have just painted it. I'll say to you what I just said to the *Wall Street Journal*, which is that there is not complete agreement among all of us in terms of what the Chevy Chase case means, and that needs to be clarified, so we can determine to what extent it is a model and to what extent it applied to the particular situation that Chevy Chase found themselves in, or that the Justice Department found Chevy Chase in.

Through the Inter-agency Task Force on Fair Lending, which I think is quite a useful body...

**CH:** Do you serve on that?

**RA:** Yes. It was convened by the Secretary of HUD, the Attorney General, and the Comptroller of the Currency, and it includes the two enforcement agencies, HUD and Justice, the Comptroller, as well as all the other bank regulators, the Fed, the FDIC, the OTS. There are some 10 or 11 members. They meet regularly on a staff level, quarterly on an Assistant Secretary level, and no less than once a year on the Secretary level to ratify principles and articulate federal policy as it relates to interpretations of the Equal Credit Opportunity Act and the Fair Housing Act on which we can agree.

To the extent that the Chevy Chase agreement stands for the proposition that you cannot purposely, or even unintentionally, organize your area of operation in a way that effectively excludes populations that are protected under the Fair Housing Act, then I think it has some principles of general application that we need to examine very seriously as we go forward.

**CH:** The voluntary agreement recently signed with mortgage bankers parallels the Voluntary Affirmative Marketing plan signed a few years back with the National Association of Realtors. How many mortgage bankers have actually signed this?

**RA:** Three, so far. Right now, we are working with some very big mortgage lenders and many others.

**CH:** Is there a different agreement for each broker?

**RA:** Yes, so in that respect it is very different from the way we operated with the National Association of Realtors.

**CH:** A criticism of voluntary plans like this is that they are intended to forestall more rigorous and effective measures, like bringing mortgage bankers under the Community Reinvestment Act. What do you think the chances are that they could ever be brought under the CRA as an alternative to voluntary measures?

**RA:** A few months ago, I thought it was unlikely that they would be. Asking me today, I would say that it is probably even more remote. Under Title VIII, the Secretary has the authority, in fact is urged to engage in voluntary programs with members of the housing industry to further the purposes of the Fair Housing Act – which is all that this is.

These are voluntary. If you don't live up to your agreement, you don't live up to your agreement. You hope they will lose in the court of public opinion, but there is no enforcement sanction there. This was not an effort to forestall regulation, and I don't believe that the mortgage bankers themselves viewed it that way. I do believe they thought of it as I think of it – as a positive effort on their part both to acknowledge there is a problem and take some important steps to improve the fair lending performance of their members by encouraging them to sign individually tailored agreements with HUD.

We have some 400 expressions of interest, and we'll be pursuing them, but we have never portrayed this as anything other than what it is: an effort to use the authority the Secretary already has under law to encourage better fair lending performance.

**CH:** The brouhaha in Berkeley – of all places – regarding what was portrayed

as your attempts to harass, punish, prosecute neighborhood residents opposing a group home caused what seemed like a quick retreat on your part and certainly created a major backlash in the press. What lessons did you learn from that?

**RA:** That is a complete mischaracterization of what happened. In the Berkeley case, a fair housing group filed a complaint with HUD that we had a legal obligation to investigate. The complaint alleged that a number of individual Berkeley residents had organized to oppose a group home for recovering drug addicts. To be fair to the Berkeley residents opposed to this, there is a large concentration of assisted housing in the neighborhood as well as homeless shelters.

The complaint was investigated over a 6- or 8-month period. The issue never came to our attention until the beginning of August of this year. And, as was consistent practice at the time, which practice we inherited from our predecessors in office, the Fair Housing Office in San Francisco investigated the case, as it investigates every other case. They asked for a whole host of information and did a number of things they do in general investigations that in this case were inappropriate, because this case really involved the protected expression of political opinion that could not have been construed to sustain a fair housing complaint against the residents. To the extent that the residents organized, testified at public hearings, wrote editorials, passed out leaflets and generally stirred things up as a way of opposing a decision by the planning or zoning commission to grant a use permit to the group home, they were engaged in protected political activity that could not have been construed as interference, intimidation or coercion under the Fair Housing Act.

However, they did one other thing, a complicating factor. In addition to all that protected talking and writing and leafletting, they also filed a lawsuit, which is conduct and not speech, and which poses a challenge under fair housing case law. If you file a frivolous lawsuit for purposes of depriving someone of their fair housing rights – a lawsuit adjudged to have been without legal or factual support – then it is possible that filing a lawsuit could be construed as interference within the meaning of the Fair Housing Act. It happens that the whole thing – including the filing of the lawsuit and the lawsuit having been dismissed – occurred before the case ever came to our attention. We got a call from the *Oakland Tribune* asking what's happening in this Berkeley case, which we didn't know anything about. So we pulled the

Berkeley case in to find out what they were talking about, and in reviewing the case I also had to look at the lawsuit that was filed, to judge whether or not it was a violation of fair housing law. I ultimately decided it was not.

Subsequent to that case, we polled the field to determine what other cases out there posed this same kind of First Amendment problem or potential problem. It turned out there were a number of such cases. That is not the way those cases should have been investigated, from a policy point of view, and it is not the way the cases will be investigated in the future. We have issued guidelines, through notice, that tell our investigators at what point those kinds of complaints should be allowed to be logged into the process, or essentially dismissed before they are filed because they clearly present only protected conduct that can't be construed to be a violation of the Fair Housing Act.

**CH:** But it clearly came off as a black eye for HUD.

**RA:** There was such a high level of irresponsible conduct on the part of the media with respect to this issue. Look, I care as much about the First Amendment, probably more than, the next guy and consider myself a constitutional lawyer. And in three weeks, once having learned of these issues, I put a binding policy in place that we believe protects against this happening again. I don't disagree with you that this was played up in the press as if somehow HUD was on some kind of mission to intimidate people who oppose group homes being placed in their neighborhood. But that's not what happened.

**CH:** I assume what also was going on was your perception that the Right was going to try to use this incident to weaken the Fair Housing Act and HUD's enforcement powers. I think you were quite prescient in seeing it that way. And what has happened since November 8 makes your resolution of the matter even smarter.

**RA:** There are a number of problems that have been brewing. These are civil rights laws after all, and there are those of us who believe that there is a unique and important role the federal government has to play when it comes to civil rights. Nonetheless, there is a growing popularity toward the notion that local control is very, very important. And I would agree that in many respects delivery of a whole host of services that have been federalized does have to be looked at again.

We have found that the most effective actors in delivering housing services and producing high-quality, low-income housing is not HUD at all, but occurs when HUD funds the right CDC or gives the money to the state, which then teams with good private sector actors. And so I have a lot of sympathy for many elements of the deregulation movement and the notion that there should be greater local control and less federal control over a lot of things, and I'm willing to engage in that debate and to try to look anew at the delivery of many of the services that have been federalized over the last 20, 30, 40 years.

But when local protest rises to the level of interference, intimidation, harassment of people who have a federally guaranteed right to free and fair housing choice, I do have a problem with that. I do believe there is an important role for federal law enforcement in that regard. And it's not something that should be up to a vote. I will resist very strongly efforts to weaken the civil rights laws.

**CH:** What will your strategy be for dealing in the new conservative Congress? How will this dramatic shift in the political climate change the Clinton Administration's fair housing and anti-redlining agenda? What will it do to the unpassed Housing and Community Development Act, to the HUD budget and to issues like insurance redlining and plans to make HMDA data more accessible?

**RA:** Housing policy, it seems to me, and civil rights policy has been very much a bipartisan effort over the last many years. The Banking Committee in the Senate, somewhat less in the House, has conducted itself in a way that has meant that the HUD bills, and even the passage of the 1988 amendments to the Fair Housing Act, have been pretty much a bipartisan enterprise. It's my hope that that tradition holds in this next Congress. Recognize that there are some who think that HUD shouldn't be in the business that it's in, that it's too big a bureaucracy, that it should be dismantled. I've heard all the scare stories. I don't know how high HUD is on their agenda. And so I'm hopeful that HUD will fare decently in the new Congress. Whether that means that we'll get every program we had hoped to get through the old Congress, or whether that means we will have to downsize and reorganize our programs as well as our personnel structure – I guess it probably means that, at a minimum.

As far as the fair housing law is concerned, I feel optimistic that its value will be appreciated. I intend to personally explain to any member of Congress who

cares to listen the history of the Fair Housing Act, including the amendments, why it's important, the strides we have taken to improve the quality of Fair Housing Act enforcement, and stress the importance of keeping the intentions of the law intact. And it is my hope that that, plus the vocal support of the people all over the nation who care about fairness and equality, will prevail. I don't think the voters have really said, even by virtue of this vote that was lopsided by party, that we don't want fairness, we don't want civil rights, we don't want federal housing policy that helps people become first-time homeowners or gives people who have been disadvantaged a little bit of a better start so that they can find a way to improve their lives and the lives of their families.

So I'm not as pessimistic as some, although I am realistic.

Copyright 1995

Back to January/February 1995 Index.

Home    News & Views    Behind Enemy Lines    Culture Currents    Block Reports    Gallery    Shop    Adv

## 4917 Third St., San Francisco CA 94124

Phone: (415) 671-0789, Fax: (415) 671-0316,

Email: editor@sfbayview.com

Wrongful mass eviction case settled by Oakland Housing Authority

 Print

by Lynda Carson

Wednesday, 15 August 2007

Oakland - After 34 families were falsely accused of being unlawful occupa disparaged as squatters - and of paying bribes to a Housing Authority clerk tenants at Lockwood Gardens public housing complex can rest a little easie Oakland Housing Authority (OHA) dropped all attempts to evict them and negotiated settlements for all of the wrongfully accused. Evidence provided courts on behalf of the accused revealed that the tenants had all signed leas

rents, given security deposits, received keys to their units, and provided birth certificates, photo identification, income verification and Social Security cards to the OHA before moving into their homes.

 Lockwood.jpg

Finding that the tenants were not unlawful occupants as alleged by the OHA and were innocent of any wrongdoing, the courts repeatedly blocked the OHA's eviction attempts, which started in April 2006. No charges were ever filed against any of the tenants at Lockwood Gardens by the District Attorney's office regarding the allegations of fraud or bribery.

As a result of the settlement, 19 families are being allowed to remain in the homes while receiving two years free rent. They also received new rental co and refunds of all past rental payments. The tenants do not have to start pay

again until June 1, 2008.

Attorneys involved in the mass eviction case believe that the other 15 famil
alleged to have been unlawful occupants may have fled in fear for their safe
receiving a number of late night visits by the OHA police, who pounded on
and demanded that the tenants must move within a five day period or face e
proceedings.

"This has been a big ordeal for me," said Lockwood Gardens tenant Ira Tur
"Before moving in, I received a call from someone in the OHA asking me i
could use a one bedroom unit, and I eventually moved into my current hous
Dec. 3, 2005, after giving up $309 as a security deposit and signing OHA
documents and submitting all the paperwork asked of me by the OHA."

"During April 2006," said Turner, "two policemen from the OHA came by
night and told me I had to give up my apartment. It was Officer Jerold Coat
treated me real bad and told me I had to get out of here. I believe that Offic
Coates still owes me an apology for all the stress he put me through, which
thinking of committing suicide at times.

"It was a real struggle to fight against this eviction because I'm a cancer pat
and a senior citizen on disability," she said. "It was Jorge Aguilar of the Ev
Defense Center who kept checking in on me at times, and he was the one th
really helped me get through this mess."

In a similar OHA Police incident during April 2006, Lockwood Gardens te
Ms. Kelly said, "I am a 41-year-old woman with an 11-year-old child, and I
very frightened by the way the OHA has been treating me," she said. "I was
terrified recently when the OHA Police showed up at my door around 10 o'
night, accusing my family of committing fraud to move into this townhouse
they served me a five-day notice to surrender my home to the OHA, or else

These experiences match similar stories told by other tenants at Lockwood
Gardens.

Eviction Defense Center attorney Jorge Aguilar says, "This is a huge victor
the tenants who fought against their evictions, and I'm very happy for the fa
The tenants were all vindicated, and the proof is in the difference between t
allegations originally made by the OHA and the recent results of the settlen

negotiated with the tenants. All the families get to remain rent free in their units, and that speaks for itself.

"The OHA wanted to go down a one-way street the wrong way in this mass eviction proceeding, and it was wrong. They tried to force a conclusion tha not factual."

OHA spokesperson Bronwyn Hogan had a different reaction to the court fil "The OHA disagrees with the rulings of the court. However, it was sensible OHA to settle this case, especially when considering that it involved 19 law which would end up being very expensive to litigate any further in the cour

"We are no longer contending that the tenants were involved in any wronge and the settlement shows that. We have made internal fixes to make sure th doesn't happen again, including the installation of a new computer system t alert us to problems in the waiting list."

East Bay Community Law Center attorney Mark Janowitz said: "I think the tried everything possible to evict the tenants from their housing in this case despite the overwhelming evidence confirming the tenants' innocence. The came to their senses and finally settled with all the families they wrongfully to evict.

"When tenants are able to obtain legal representation, they can fight the wo of accusations being thrown at them such as what the OHA did to these ten believe the entire community benefits from such organizations as the East I Community Law Center, the Eviction Defense Center and attorneys like Bc Salinas, who are willing to offer legal representation to those in need."

According to attorney Bob Salinas, "The hardest thing to understand about case was knowing that the OHA had enough information to know the tenan innocent of wrongdoing, but they pressed forward with their evictions anyv can't understand why they would do that.

"The settlement actually occurred last May, but we waited until early Augu public with the news because the OHA Board of Commissioners had to app and that whole process took some time. I thought the resolution reached wa for the tenants and attorneys involved in the case."

Lynda Carson may be reached at This e-mail address is being protected fro
bots, you need JavaScript enabled to view it or (510) 763-1085.



**Tag it:** ⊠ Delicious  ⊠ Furl it!  ⊠ YahooMyWeb  ⊠ Digg  ⊠ Yahoo!

**< Prev         Next >**

[ Back ]

Home | News & Views | Behind Enemy Lines | Culture Currents | Block Re

SF Bay View National Black News
Site Design By Bluelady

Joomla! is Free Software released under the GN

Exhibit's E Page 1 of 2

Oakland Housing Authority 7/29/94 and Madeline Hastings, Director

U.S. Department of Housing and Urban Development



July 29, 1994

OAKLAND HOUSING AUTHORITY
C/O BARBARA CAMPBELL
1619 HARRISON ST.
OAKLAND, CA. 94612

Ms.Barbara Campbell

    I'm writing you again concerning Lamont's income, and
the fact remains that Lamont Williams did not have an income
of $5,000 year. So please reimburse me as soon as possible or
I shall be forced to take you to small claims court to my money.
I believe by now you realize how good my words are when I make a
promise. This is the second, notice and it will be the last one.
I've also spoke to Mr Jim Wilson about this situation. You can
make a cashiier's check to me for the amount of $1,344.00, which
include the month of August 1994. The cashier's check should be
in this made out to me, unless you can correct this mistake,
please feel free to contact pasty.

Thank you ahead.

Sincerely,

J.A. Williams.

cc; Jim Wilson



Jacqueline Williams
412-45th Street
Oakland, Ca. 94609
August 14, 1994


Madeline Hastings, Director
U.S. Department Of Housing And Urban Development
Washington, D.C. 20410-5000


Dear Madeline Hastings,

        I am writing this letter concerning a Ms.Barbara Campbell
who is a represenative for the Oakland branch of housing authority.
I wrote Ms. Campbell a letter concerning reimbursement of $1,344
dollars that housing owes me. Ms Campbell claims that my sons
income was five thousand dollars a year. I send Ms.Campbell a letter
from Ms. Ann Thompson, along with another from Mrs. Anna Howard
stating that Ms.Campbell had made a mistake. Ms.Campbell didn't
care if she was falsifying documents, and volating California
Penal Code Section 134, due to the fact that the Internal Revenue
Services was audit Oakland Housing Authority and they needed somethin
to show. My son was not getting a income of five thousand dollars.
Ms.Campbell has viloated California Penal Code 647  with disorderly
conduct, California Penal Code 6.10. on goverment assistance prog-
rams. Penal Code 6.11 on civil rights, and Penal Code 532a reguarding
false financial statements. To say the least Ms.Campbell has displaye
a blatent disreguard of laws controlling not only her job but the
state population of california. Due to this blatent and bold disre-
guard of my rights, and viloation of Several penal codes I am writ-
ing you one again, and I am concerned as to what else has Ms. Campbel
lied about, falsified and just plain covered up. All I am concerned
about is the reimbursement of the money Housing owes me and Ms.Campell
nonprofessionalism. I will be forward a copy of this letter to Interna
Revenue, and should there be cause I'll then further be forced to
file legal litigation based on this discrimination at once. Let the
record reflect that Ms.Campbell is scheduled to come to my residence
on August 17, 94 at 12p.m. noon. I have instructed my son in the
event she becomes disorderly to escort her out and contact my lawyer
immediately. No one should have to deal with her unprofessionalism, or
her trials and the trouble she put people through. Enclosed for your
records are copies of all the letters Ms.Campbell has recieved.


        Thanking you in adance for your offices cooperation in  helping
to rectify this matter, and I looking forward to diligent professional
result from you soon.

                                        Sincerely,
                                        J.Williams.